# EXHIBIT C

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY HOWELL, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>CHECKR, INC.<br><br>Defendant. | Case No. 3:17-cv-04305-SK |

## DECLARATION OF STAN V. SMITH, PH.D

October 8, 2018

## DECLARATION OF STAN V. SMITH

I, Stan V. Smith, hereby declare the following:

1. My name is Stan V. Smith. I am over 21 years of age, of sound mind, capable of executing this Declaration, and have personal knowledge of the facts stated herein, and they are all true and correct.

## EXPERT BACKGROUND AND QUALIFICATIONS

2. I am President of Smith Economics Group, Ltd., headquartered in Chicago, IL, which provides economic and financial consulting nationwide. I have worked as an economic and financial consultant since 1974, after completing a Research Internship at the Federal Reserve, Board of Governors, in Washington, D.C.

3. I received my Bachelor's Degree from Cornell University. I received a Master's Degree and my Ph.D. in Economics from the University of Chicago; Gary S. Becker, Nobel Laureate 1992, was my Ph.D. thesis advisor. The University of Chicago is one of the world's preeminent institutions for the study of economics, and the home of renowned research in the law and economics movement.

4. As President of Smith Economics, I have performed economic analyses in a great variety of engagements, including damages analysis in personal injury and wrongful death cases, business valuation, financial analysis, antitrust, contract losses, a wide range of class action matters, employment discrimination, defamation, and intellectual property valuations including evaluations of reasonable royalty.

5. I have more than 40 years of experience in the field of economics. I am a member of various economic associations and served for three years as Vice President of the National Association of Forensic Economics (NAFE) which is the principal association in the field. I was

also on the Board of Editors of the peer-reviewed journal, the Journal of Forensic Economics, for over a decade; I have also published scholarly articles in this journal. The JFE is the leading academic journal in the field of Forensic Economics.

6. I am the creator and founder of Ibbotson Associates' <u>Stock, Bonds, Bills, and Inflation</u> (SBBI) Yearbook, Quarterly, Monthly, and SBBI/PC Services published by Morningstar, Inc. SBBI is widely relied upon and regarded as the most accepted and scholarly reference by the academic, actuarial and investment community, and in courts of law. This series, which acknowledges me as the Originator while a Principal and Managing Director at Ibbotson Associates, is generally regarded by academics in the field of finance as the most widely accepted source of statistics on the rates of return on investment securities. Originally published in book form, the SBBI historical series is now available at Morningstar on various Morningstar software platforms.

7. I wrote the first textbook on Forensic Economic Damages that has been used in university courses in various states; as an adjunct professor, I created and taught the first course in Forensic Economics nationwide, at DePaul University in Chicago. I have performed economic analysis in many thousands of cases in almost every state since the early 1980s.

8. I have been designated in numerous civil cases as an expert witness to opine as to the economic value of damages and impact incurred by consumers by inaccurate credit reporting. My opinion as to the value of a class settlement in a comparable Fair Credit Reporting Act class action case settlement was accepted by the District Court in *Franklin Clark, et al v. Experian Information Solutions, Inc., et al*, Civ. No. 8-00-CV-1217-24 (D.S.C.). I have never been stricken as an expert witness in a Fair Credit Reporting Act case.

9. My curriculum vitae is attached, listing all my publications in the last 10 years and beyond. My hourly rate in this case is $565 per hour. The list of all cases in which I have testified in the last 4 years is also attached.

## DOCUMENTS REVIEWED

10. In order to perform this evaluation, I have review the following materials:

   a. Class Action Complaint for Damages;

   b. Plaintiff's Motion for Preliminary Approval of the Proposed Settlement and Memorandum in Support, Including Exhibits;

   c. Order Granting Motion for Preliminary Approval of Class Action Settlement;

   d. Class Action Settlement and Release; and,

   e. The publicly-available reports cited in the footnotes herein.

11. I have also obtained information for this opinion directly from Class Counsel, such as estimated class size and an explanation of the origin of certain documents and information.

## FACTORS AND ANALYSIS IN DETERMINING THE FAIRNESS AND REASONABLENESS OF THE SETTLEMENT

12. On or about June 23, 2017, Plaintiff Gregory Howell, for himself and a putative class, filed the Action, alleging that Checkr violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681(c), by reporting adverse information, other than criminal convictions, which was older than seven years from the date of the consumer report. The Complaint alleges that this violation was willful and entitled Plaintiff and the putative class to statutory damages, punitive damages, attorney's fees, and costs.

13. Class Counsel has engaged in arms-length negotiations with Checkr with a view toward achieving substantial benefits while avoiding the cost, delay, and uncertainty of further litigation. The Parties reached a settlement after jointly retaining the services of a mediator and engaging in an adversarial day-long mediation in San Francisco, California, on March 1, 2018, and engaging in additional arms-length negotiations in the days and weeks after that mediation.

14. The settlement provides for monetary relief and injunctive relief.

15. The monetary relief is a common fund of $4,460,000. This amount includes all Individual Settlement Payments, and Class Representative Service Payment, the Class Counsel Fees, and Administrative Costs.

16. The Class Members were identified by a review of Checkr's records. The class is composed of 96,040 individuals.

17. The injunctive relief has two pieces. First, Checkr will not report low-level offenses older than seven (7) years, regardless of whether considered criminal in the relevant jurisdiction, for at least eighteen (18) months. Second, should Checkr decide after that to resume reporting low-level *criminal* offenses older than seven (7) years, it must first use data compiled by Class Counsel in the settlement process of reviewing the Settlement Class Members' reports, and consult an expert regarding its reporting procedures for these types of records.

18. The Settlement Class consists of 96,040 consumers upon whom Checkr produced a consumer report which included records older than seven (7) years, and which included the following terms in the "charge type" field: "infraction," "ordinance," "violation," "petty offense," "traffic," "citation," and "civil."

19. The Class is broken down into two categories for purposes of determining who needed to return a claim form, and who would just automatically be paid.

20. The first category, Auto-Pay, are Class Members who had an "infraction" older than seven (7) years on their report(s) from North Carolina, Florida, or Virginia, and/or Class Members who disputed low-level offense information with Checkr, and the dispute resulted in a change to the relevant records on their report. Plaintiff is in this group.

21. The second category, claims-made, are Class Members who had a low-level offense older than seven (7) years on their report(s) where the low-level offense was something other than an "infraction" from North Carolina, Florida, or Virginia.. Once a Class Member in this category submits the claim form, Checkr then submits that Class Member's report, redacted but for the relevant record(s), to the settlement administrator. Class Counsel then reviews the record, researches whether it is criminal or non-criminal in its jurisdiction, and records the findings. If it is non-criminal in nature, that Class Member is then a Valid Claimant for purposes of payment.

22. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

23. Checkr continues to conduct background checks on Class Members and non-Class Members who apply for employment. It is a rapidly growing company[1]. Checkr has also announced that it will be providing continuous background monitoring to some of its largest clients, including Uber[2]. Intuit, the owner of TurboTax, estimated that the gig economy consisted

---

[1] "Background Checks Pay for Checkr, Which Just Rang Up $100 Million in New Funding," by Connie Loizos, https://techcrunch.com/2018/04/12/background-checks-pay-for-checkr-which-just-rang-up-100-million-in-new-funding/

[2] "Uber Begins Monitoring U.S. Driver Background Checks Continuously," by Kia Kokalitcheva, https://www.axios.com/uber-begins-monitoring-us-driver-background-checks-continuously-180d59db-1040-48a7-b9fb-0b6e06ba299f.html.

of approximately 4 million workers in 2017, a number that they expect to grow to 7.7 million workers by 2020[3].

24.     Using extremely conservative assumptions, namely a conservative estimate of 4 weeks in lost earnings for class members and future applicants who have improper information included in their reports, at the national minimum wage of $7.25 per hour for 40 hours per week, and assuming that Checkr's volume of business merely remained constant and did not grow, the continued inclusion of this outdated low-level offense information in Checkr's reports would result in lost earnings of approximately $3,736,043 over the 18 month injunctive relief period.  These lost future earnings will be avoided as a result of the changes implemented through the Settlement.

25.     The settlement will also result in the avoidance of employment delay.  Applicants with low level offense information on their reports likely suffered a delay in their employment due to the additional time that employers spent reviewing the information contained in the consumer reports.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

26.     Using an extremely conservative estimate of 1 week in lost earnings for these class members and future applicants, at the national minimum wage of $7.25 per hour for 40 hours per week, and assuming that Checkr's volume of reports would remain constant into the future, this would result in lost earnings of approximately $1,946,075 over the 18 month injunctive relief

---

[3] "Checkr and Uber Built a Service to Monitor Workers' Background Records," by Kyle Wiggers, https://venturebeat.com/2018/07/13/checkr-and-uber-built-a-service-to-monitor-workers-background-records/

period. These lost earnings will be avoided through the implementation of the relief provided by the Settlement.

27. The total value of lost earnings that can be avoided during the 18-month injunctive relief period is approximately $5,682,118.

28. This figure is the minimum amount, as it does not include the value of the settlement beyond an 18-month period. Notably, Checkr is barred forever from resuming the reporting of criminal information, so a significant portion of the injunctive relief will continue indefinitely. Further, this number assumes Checkr's volume of business remains constant, and that the number of people affected in the future would be the same as the number affected in the past. In reality, Checkr's business is rapidly growing, and its largest client, Uber, has switched to continuous monitoring, meaning that Checkr's volume of reports is rapidly increasing. Given the introduction of continuous monitoring, many of the class members will directly benefit from the injunctive relief because they themselves will be subject to such reporting.

29. There is another important value to class members. Had plaintiffs' counsel not filed this case on behalf of the Plaintiff and ultimately all class members, any aggrieved individual would have spent at least one year in court effectuating, if successful, the removal of the information from their consumer reports. During the time it would take litigating the matter, the aggrieved individual would have sustained significant damages because of the information on the consumer report.

30. In addition to the foregoing, one must also consider the economic value of time. In addition to the "out of pocket" costs that class members would have incurred, but for this settlement, to repair their damages, they would also have had to expend considerable time in going through the dispute process to repair their reports. A conservative estimate of the time that would have been involved for an individual class member is two hours. This would encompass the time

expended in meeting with an attorney, gathering relevant documents and information, communicating with Checkr, and the like.  The hourly value of the costs associated with time spent and loss of productivity will be calculated based on the average of the mean hourly wages of $19.76 for Bookkeeping, Accounting, and Auditing Clerks and $19.74 for Secretaries and Administrative Assistants in the United States, which is $19.75 in year 2017 dollars[4].  Using $19.75 per hour as a reasonable value for time, and estimated 2 hours per class member, and the class estimate of 96,040, it is my opinion that the aggregate economic value of the time saved to the class is $3,793,580.

31.     The likely monetary value of this settlement is difficult to quantify absent substantially more research.  However, it is beyond reasonable dispute that the value of the settlement is in the millions of dollars.  In fact, even using the conservative numbers used for the above assumptions, the total cumulative value of the settlement would be upwards of $9,400,000.

32.     All of these benefits provide substantial additional economic value to consumers and class members beyond just the correction and removal of the information from their consumer reports.

33.     The above values are quantifiable.  In addition to those that are quantifiable, there are significant and real economic benefits that derive from this settlement that are not quantifiable.  These benefits also militate very strongly in favor of approval of the settlement.  Most importantly, there is some significant number of people in the future, beyond the 18 month injunctive relief period who will not be affected by the same problem that initiated the lawsuit.  *All* of those unknown and uncounted persons will enjoy the benefit of that part of the settlement that resulted in the change to the way the Checkr conducts its business.

---

[4] U.S. Bureau of Labor Statistics, Occupational Employment Statistics, <u>May 2017 Metropolitan and Nonmetropolitan Area Occupational Employment and Wage Statistics,</u> www.bls.gov/oes

34.     My opinions as to the economic value of the settlement to the class members are to a reasonable degree of economic and professional certainty. In reaching these opinions I have used my education, training, and experience, together with the information I have been provided.

35.     It is my opinion, based upon the foregoing, that the terms of the settlement in these cases result in substantial benefit to the members of the class, both in economic and less quantifiable ways. I urge its approval.

*Stan V. Smith*

Stan V. Smith, Ph.D.
Executed this 8th day of October, 2018 in Chicago, Illinois